Texas Tobacco Barn v. U.S. Department of HHS. We'll hear first from Mr. Troutman. Good morning, your honors. May it please the court. The court should grant review and vacate the appeals panel's final decision for three reasons. First, the government concedes in its brief that the civil monetary penalty at issue here implicates the Seventh Amendment. It fails, however, to overcome Jarcesi's private rights presumption. Second, Congress ignored Brown and Williamson's major question finding when allowing FDA to make the core legislative decision of whether to regulate vaping products and when to regulate vaping products. It then crafted an ambiguous appropriate for the protection of public health standard to govern that regulation. And third, from an evidentiary standpoint, the record does not support the conclusion that the product at issue contained interstate shipped components identified on the ingredient list which the government introduced at trial. I welcome the court's questions. Your honor, no, no. Well, so, I mean, I'm focusing here on the public rights exception. Sure. And it seems to me that the disagreement between the parties comes down to how do you characterize this action, if that's the right word? Is it a public health measure, the government seems to say? You're saying, well, no, it's about misbranding. It's about adulterated products. How am I supposed to, I mean, there's some truth, I guess, to both of those. How am I supposed to work that out? I think, I think Judge O'Connor, in his opinion in Wolferic, recently addressed this. And he noted that JARCESI does not have a public rights exception or a public rights element to the public rights doctrine. Certainly, there is none here. Public, I mean, public health really, he points this out, is really a state law prerogative of the Tenth Amendment. Yes, the federal government does have public health regulatory schemes, but it's mainly a matter of state law jurisdiction and not federal jurisdiction. Certainly, if there is no public rights element to the, or public health element to the public rights doctrine, then we're under the presumption of private rights. And as this Court said in the AT&T case, that the public rights doctrine is to be carefully handled with care, I believe is what the Court, Judge, I believe that was your opinion. Oh, yeah, it's an excellent opinion. I would agree. I would agree with that. However, the Supreme Court has, I believe, granted cert in that case, right? I believe it has, yes. So what, I mean, what inference am I supposed to draw from that? That they're going to equally agree with you. Oh, okay. I think there's a circuit split on the issue. There is a circuit split, but this Court obviously is going to follow its own precedent. Sure. And Wolf-Erik is certainly, I think, helpful to us because it involves the exact same schemes, civil monetary penalty schemes. And if you look at the purpose of these penalties, what is the purpose? Is it remedial or is it punitive? Is it deterrent? Certainly, it checks those boxes. It is deterrent. It is in, who gets the money? Is it going to a victim to compensate them, remediate this, or is it going to the Treasury? It's going to the Treasury. Certainly, it considers factors of the gravity of the offense. Is this a repeat offender? There are graduated penalties. You start off low, you can get upwards of $2 million if you keep doing this. So it looks like, very much like it's a private right. Were there common law actions for adulterated, misbranded items? There was, Judge Jones. In the Hutt article that I cited, a journal article that I cited from 1960, does a great analysis of adulterated and misbranded products going back to English common law. Many of the things that we consider today, like for instance, the idea of a baker's dozen, comes from the idea of misbranding, the cheat, under English common law. They were traded as crimes back then. I'm certainly glad that we have softened our tone on adulterated and misbranded products. But certainly, they did have jury trials in the pre-merger English common law courts for adulterated and misbranded products. And FDA looks at this as, well, these are statutory definitions. Yes, but those statutory definitions closely track what the English common law considered to be adulterated and misbranded in consumable products. We certainly didn't have tobacco products or vapor products in the English common law courts. I think what the government is saying, and they can make their argument, is that, well, there's one thing to say that there were misbranded products, you know, and actions at common law, but the federal government has sort of taken that into a different realm here, and they have sort of had a regulatory structure where they say, well, we've defined this as a misbranded product because it doesn't follow our regulations. So it's different. It's new, and it's different. What's your response to that? Well, it's really not novel because it's really a consumer protection. I think that's the argument the government is trying to make is this is to protect the consumer, to protect the marketplace. So were the fines in JARCESI. It was to protect the marketplace from securities fraud. What's the difference? If it's a private right in JARCESI, it should be a private right here. Okay. So fraud in JARCESI. Here, misbranding adulterated products. AT&T was failure to control personal information negligence. Yeah. And the one thing about your decision in AT&T, which I think is very helpful, is it points out or it suggests that a civil monetary penalty scheme can actually have an origin in several different common law causes. Yeah. Okay. Thank you. Turning to the major question issue, West Virginia, Brown and Williamson said they're regulating tobacco products as a major question. Judge Gorsuch's concurrence in West Virginia versus EPA sums up this issue very well. It says Congress must decide important issues while leaving agencies to merely fill up details. If Congress had simply said this is what a tobacco product is, FDA, go regulate them. I wouldn't have an argument. I wouldn't be standing here right now. That's not what Congress did. Congress said this is what a tobacco product is. FDA, go regulate four specific subset products. It then deferred to FDA to essentially define the outer parameters of its regulatory authority by allowing it to deem by rule any other products. Remind me, what were the four specified products? They were, it was cigarette related. It was cigarette, cigarette tobacco, smokeless tobacco. I forgot, the fourth one escapes me. Roll your own tobacco. I think it was roll your own tobacco. They're all combustible products. And certainly, we have no fault with Congress wanting to regulate, that's one of the most precunious consumable products. You're saying the agency can't expand that to a different product? The deeming product allows it to expand it to anything else that meets the definition of tobacco product. And the problem here is the NICAPUR court found Congress gave FDA no guidance. Actually, in the NICAPUR case, FDA acknowledged that there was no guidance. And it said we don't need guidance because the language is so broad that we have unfettered authority. I'm not quite. What about our, so we have our decision in big time vapes. Isn't that a problem for your non-delegation? I think it's a different issue. And here's why it's a different issue. The Tobacco Control Act, from what I can find, and maybe your law clerks are better at this than I am, this is the first instance. The Tobacco Control Act, from what I can find, is the first instance in which Congress has adopted a new regulatory scheme in response to a major question finding about the subject matter. There is no test. The Supreme Court has not announced a test because it's never had this case come up before. As to what constitutes a regulatory scheme, what's the test that we're to apply here? I would certainly suggest that there should be heightened scrutiny. This is a different case than big time vapes. Certainly deciding what to regulate, when to regulate. The three issues that are common to any regulatory scheme is what to regulate, when to regulate, how to regulate. The what and the when questions are core legislative functions. Those are core legislative questions because it defines the core of what the agency is entitled to do. The how to regulate is a mixed question. That's why guidance is so important. Certainly FDA is, of any of the agencies, probably FDA might be the best equipped to regulate tobacco products. But it's certainly Congress's job to tell it what to do and when to do it. That's what's lacking here. Well, as you may recall, for decades and decades, Congress told the CAB to regulate air traffic, airlines, and whoever it was to regulate the trucking industry and the railroad industry, the ICC, in the public interest. And those delegations were held to be sufficient. So are you saying that you can still have a major questions issue, even if there's a constitutional delegation? Again, those descriptions that you gave did not involve a major question. This is why this issue is not. They sure did. The entire interstate trucking, railroad, and airline industries were regulated. Correct. But again, these were not regulatory schemes that were adopted because the Supreme Court told Congress you have to do this if you want this subject matter regulated. Oh, by the way, given the history and scope of it, it is a major question. This is sort of a unique issue. And I've got about a minute left. I'm going to turn to the evidentiary issue. The product at issue here is 1.2% nicotine solution, 12 milligrams per milliliter. The government introduced at trial an ingredient list that was filed by Texas Tobacco Barn with its premarket application. It was Exhibit 11, I believe, and it's at pages 172 to 174 of the appendix. That is for a 2.4% solution, 24 milligrams per milliliter. FDA's guidance tells you that if you have two products, one with one nicotine string, one with another, they are separate products. They are not one and the same. The ingredient list for that 2.4% product, the government did not produce evidence of that product, those ingredients, being in the 1.2% product. The difference between the two is my BMW 325 and my newer BMW 340 are not the same car. When you hit the accelerator, you know it. The 2.4% is a lot stronger product, is a different product. You can't switch one with the other. I see my time is up. Thank your honors. Thank you. You have an opportunity for rebuttal, I believe. Yes. Okay, Mr. Fraser, is your case, did the government appeal the decision in Wolfrick? They did, your honor, and both parties in that case put that case in abeyance until the court decides this case. Oh, okay. So, obviously the Seventh Amendment issue here really comes down to whether this fits within the public rights exception to the Seventh Amendment. And I think in the AT&T case, this court warned that the public rights exception can't be read in a way that blows a hole through what is meant to be a narrow exception to the Seventh Amendment right to a jury trial in Article 3. And I think that's what the government's argument does here. At the end of the day, what the government is arguing is when the government regulates public health, there is no need for the Seventh Amendment. There's no need for a jury trial. They have no case law that supports that. They rely on a Supreme Court case, Crowell, that is not dealing with the Seventh Amendment or public health exception to the Seventh Amendment. In that case, the Supreme Court gives a laundry list of examples of different types of federal agencies that can be set up under Congress's power, including agencies that regulate interstate commerce. And it cites for that proposition the Houston case, which is a case that did not deal with Article 3 at all. That case dealt with whether a federal agency could adopt a rule setting forth standards for a certain type of meat. Yeah, I was going to ask you about the Houston case because I thought that received a lot of emphasis in the government's brief. So tell me more about that case. Is that about meat? What is it about? It was, I believe, maybe the Secretary of Agriculture setting forth appropriate standards for the interstate sale of pork, I believe, which was through a rulemaking process. It was not a court saying that if someone were to be accused of violating that regulation and subject to a civil money penalty, there would be no regulation. Or give up their Seventh Amendment. That's exactly right. And in the oceanic, I'm sorry, in the Jerkacy case, the Supreme Court made clear, was talking about this oceanic steamship case that dealt with the public rights exception. The court went out of its way to say that case does not say that the federal government or any time it is, any time Congress is exercising one of its enumerated powers that you are then, therefore, in a land where the public rights exception applies. Do we have to worry about Atlas Roofing here? I mean, that came up a lot in Jerkacy. I don't think so because the government's not arguing it here. They didn't argue it in my case. I think the government realizes that that case doesn't say what it wants it to say. Well, I mean, it's certainly a case that the Supreme Court seems to have, I don't know if limited is the right word, but it distinguished it quite a bit in Jerkacy, as I recall. Yeah, I think the majority there didn't see a need to explicitly overrule it, but its opinion makes pretty clear that it does not think that it's, it thinks its days are numbered. In the AT&T case, this court said that when you're, the public rights exception, it's a narrow exception for matters that could have been determined exclusively by executive and legislative functions. And here I want to point out that we're not dealing with a situation here where the alleged offense is only an offense that the government could bring in an administrative forum. And in fact, this violation, at the end of the day, the violation of the distribution of an adulterated product in interstate commerce, that's also a criminal offense. It's 21 U.S.C., I think it's 330, 333A, that's any distribution of an adulterated product you're subject to one year in prison or a $1,000 fine. And then finally, on this definition of adulterated and misbranded, if you look at the Food, Drug, and Cosmetic Act definitions of adulterated and misbranded tobacco products, which are in 21 U.S.C. 387A and B, I believe, there are also definitions of adulterated and misbranded products that are similar to the common law definition, a product that has poison in it or labeled in a misleading manner. I see I'm out of my time, so if there are no questions, thank you. Okay, thank you. All right, Mr. Peters. Good morning, and may it please the Court, David Peters on behalf of the United States of America. As this Court has recognized, Congress enacted the Tobacco Control Act to address the public health concerns caused by the rampant use of tobacco products, especially among the nation's youth. What's the problem with nicotine other than that it's addictive? Your Honor, it's a drug that Congress saw fit to regulate, and that is no one has challenged Congress's ability to regulate tobacco products. I'm just wondering, I mean, I thought the whole point of tobacco regulation was inhaling the smoke. Your Honor, the Congress that enacted the Tobacco Control Act found made extensive factual findings about the dangers of tobacco products, and it granted Congress the authority to regulate tobacco products, including tobacco products, which Congress defined that the FDA deemed to be subject to the Act. And it also authorized the FDA to take enforcement actions for entities that manufacture products that aren't authorized by FDA, and that is exactly what this manufacturer did here, and that scheme of regulation and administrative enforcement is constitutional. You know, this Court already decided in big-time vapes that there is an intelligible principle and that this delegation passes muster under the non-delegation doctrine, and all that the petitioner is arguing here is that the delegation is illegal, and big-time vapes controls that. And the specific enforcement action taken here, which is to enforce the Tobacco Control Act's pre-market authorization requirement, which is a novel, which the Supreme Court has recognized is a novelty that is an innovation on the common law. That enforcement action concerns private rights. Sorry, concerns public rights.  Concerns public rights, and therefore can be assigned to the FDA for adjudication. Where did the Supreme Court say all that? In the White case, Your Honor, and the White case. Wages from White Lion? There as well, Your Honor. You're taking a little liberty with the extent of that, aren't you? I don't think so, Your Honor. There the Supreme Court was describing the pre-market authorization requirement in the FDCA. The Tobacco Control Act's pre-market authorization requirement is directly modeled on and fashioned on that. And in describing that innovation, the Supreme Court there said that this is an innovation on the common law. There wasn't any requirement at common law to have a pre-market authorization. Well, securities fraud is also distinguishable from common law fraud, right? That's what the Court said in Jarchezian. But our point here is, Your Honor, there's no similarities. I mean, in Jarchezian? Well, I mean, okay. So we heard this in Jarchezian, which came out of this court. Okay, it's not common law fraud. It's securities fraud, and there's a novel scheme, and it's different. Okay, the Supreme Court said no. In AT&T, we had the mishandling of sensitive customer information, and the government said, well, it's different than common law negligence because, et cetera, et cetera, et cetera, new regulatory scheme. We said no. Obviously, the Supreme Court has granted certs, so maybe they'll, who knows what they'll do. So here it does, I guess I want you to respond to that. It sounds reminiscent, your argument sounds reminiscent of those other arguments, which is, well, this is new, but they're saying, well, no, there's common law, misbranding, adulterated products, and this is sort of, sure, the newness may be, there's a regulatory mechanism, but does that really make it new for purposes of a Seventh Amendment, right? This is different than both AT&T and Jarkizi because the product here is adulterated and misbranded because as those two terms are defined by statute, the reason they're adulterated and misbranded, it's not because they have poison in them or it says 1.2% nicotine, but it's actually 2.4. The only reason they are adulterated and misbranded here is because they did not go through the premarket authorization requirement. Right, but what's the purpose of the premarket authorization? What's the purpose of that? The purpose of the premarket authorization is to require that when, it's the same in the FDCA, right? It's like pharmaceutical companies can't sell drugs unless they register them with the FDCA. A tobacco manufacturer can't sell tobacco products. I get that, but what's the underlying purpose of that? I mean, the underlying purpose is to protect public health, Your Honor, to make sure that individuals who are going out and selling this. I'm just saying that sounds like the whole purpose behind adulterated and misbranded. I understand your argument. It's fine. It's a good argument. But I'm just trying to get at whether this is sort of the same story we've heard before. I don't think it is. I mean, each invocation of the public rights exception has to be analyzed on its own terms. And in both Jarkizi and in AT&T, the courts there said, look, this is a claim that looks like a common law claim, and the principles that it's based upon, so this looks like a fraud claim, the securities fraud provisions are derived from, have an enduring link to common law fraud principles. This court in the AT&T case said, look, this looks like a negligence claim. So there's a long history. So let's take an SEC case where to regulate fraud, the SEC said you have to file not just a quarterly statement, but one of their typical examples, companies will file updated public notices when certain things have been done in the company that may affect the standing or the stock market value. So suppose the SEC issued certain regulations about when and how and to whom you have to publish interim notices of significant developments, and somebody violated not because they didn't publish, but because they didn't publish it in the right forum or the right language or something like that. Are you trying to divorce the purpose from the technicalities of regulation? That's what it sounds like. No, you're not. Well, you're saying this is remote. On the one hand, you're saying it's public health. On the other hand, it's unlicensed. Well, it's unlicensed because FDA thinks that involves public health. The Supreme Court has recognized that certain statutory schemes that address public health may well be public rights schemes. Give me a good example. I have a few, Your Honor. So the Crowell Court said that public health regulations are a familiar example of public rights schemes. And I want to be clear, and I have two more, but just to be clear, we're not suggesting that anything that touches on public health is necessarily a public right. I mean, what's the limiting principle? Yeah, so the example that the Supreme Court gave in Crowell is the Houston case, and that was a case in which Congress was regulating the shipment of hazardous food and goods through interstate commerce, and that's exactly what we have here. They pointed to the Houston case. My friends on their side have characterized that just as about whether there was the ability of the Secretary of Agriculture to promulgate a regulation. The statutory scheme there did give the Secretary of Agriculture that power, but that case was about the Secretary applying the regulation to a specific set of factual questions. The way the Supreme Court characterized the case was whether the Secretary could decide such questions of fact. And we know from the Supreme Court's decision, Stern v. Marshall, that if something concerns private rights, it has to be decided. Even mundane factual disputes have to be decided in an Article III court. And so Crowell was right to point to Houston and say, look, that's an example where the agency is making factual determinations, applying regulations, and determining whether goods can be shipped in interstate commerce. That's the exact same thing we have here. And the third example I'd give, Your Honor, is the Thomas case, Thomas v. Union Carbide. That's the case that the Jarchese court cited approvingly, and that's the case involving the Federal Insecticide, Fungicide, and Rodenticide Act. And what happened there was it was a registration scheme much like this one to sell pesticides or insecticides. Companies had to register with, at that point, EPA to sell their products. And the Supreme Court there was addressing not an enforcement action, but a provision of the statute that called for an arbitration between two private parties. And the Supreme Court said, look, that's a public rights scheme. That's the kind of thing that Congress can assign, in part because it's integral to a statutory scheme that serves the public health. OK. So that was Crowell, Houston, and the last one? Thomas v. Union Carbide. Thomas. And, again, the Supreme Court in Jarchese is citing Thomas approvingly. Of course, Crowell was about someone injured in navigation. So this is dicta. And when they talk about it, they're talking about just in general, they cite Murray's lessee versus Hoboken. And then they say familiar illustrations of administrative agencies in connection with the exercise of Congress and power, taxation, immigration, public lands, public health, facilities of the post office, pensions, and payment to veterans. I would say that's a bit extravagant in light of Jarchese. I think it's helpful to look at the examples that Crowell says. Then it has a footnote, and it gives examples of these cases. It's still all in the context of general dicta. Perhaps, Your Honor. It's Supreme Court dicta. But I would say that the example. But, I mean, I'm not even clear that this is all they're talking about is sort of an assignment in general. Crowell was not about the Seventh Amendment, was he? I think what's helpful about Crowell, Your Honor, is it points to Houston. And the reason, as we were just talking about, the reason why Houston is a helpful example of what a public rights scheme is is that it's an example that is very close to this one, in which Congress is regulating hazardous goods or foods, hazardous food or drugs that are shipped into interstate commerce. It's a system in which Congress has assigned to an agency the authority to make factual determinations. We know that if Congress is making those kind of factual determinations in individual adjudications, that's the type of thing, that's a public right. I think that's the reason why Crowell is helpful here. But you could also look at Thomas. We're talking about civil penalties here, which I believe you acknowledge implicates the Seventh Amendment. We do, Your Honor, but that's not the end of the inquiry, right? The Jarchese decision, the AT&T decision would be much shorter if all that mattered was there was a civil monetary penalty. I mean, the Supreme Court in Jarchese then went on to look at, is this still a public rights scheme? It pointed to the Oceanic Navigation Services case. That's the case about foreign commerce and immigration in which the Secretary of Commerce imposed a money penalty on a company through a statutory scheme, and the Supreme Court said that was perfectly fine because that was a public rights scheme. So just because there's a monetary penalty, that's not determinative of whether this is a public rights scheme. And the reason this is a public rights scheme is because, as I've said, the specific enforcement action being taken here is to enforce the premarket authorization requirement that's in the Tobacco Control Act, and there is nothing like that at common law. My friends on the other side point to a series of cases from a 1960 article, but that's all criminal cases. And when the Supreme Court in Jarchese is looking at private rights, it's looking at things like contract cases, tort cases, property cases. So the criminal law is just not an appropriate analog to determine whether something is a private right. Well, it seems to me you're getting back into Atlas Roofing because Atlas Roofing says they were creating a building code through the federal government, and the Supremes cut back on Atlas Roofing considerably. But what you're saying is if you go about regulation vehemently through affirmative requirements like licensing scheme, that moves even public health, because you're admitting not all public health implicates public rights. The Jarchese court in discussing Atlas Roofing says, look, the reason why Atlas Roofing was fine as a public right is because it had no common law soil with it and wasn't based on common law principles. It's not like fraud cases that have this enduring link. Well, actually, common law, there was the fellow-servant doctrine originally, which insulated employees from hazards in the workplace. But there had been a lot of inroads made in the fellow-servant doctrine, if I'm not mistaken. So, I mean, that's a complicated argument, it seems to me. I think the cases that we would rely on... You know, back at the medieval town square markets were heavily regulated so that somebody wouldn't sell bread that had a whole bunch of weevils or chaff in it. Certainly. And I suspect there was a common law remedy in the nature of fraud or deceit for any person who bought adulterated, misbranded items, right? And perhaps, Your Honor, my point is that the reason why the petitioner here violated the Tobacco Control Act is not because they defrauded anyone. It's not because they deceived anyone. It's not because they breached a contract with a buyer or committed a tort. What they did is they sold a product without going through the FDA's pre-market authorization requirement. And there is nothing like that at the common law. But there's also nothing post-Jarczy that says that this is okay as a matter of public rights. Certainly, Your Honor, Jarczy, this Court would be addressing this case post-Jarczy, and I'm not aware of a case that is directly on point. Can you tell me, remind me, what is the nature of the infraction with respect to the pre-market authorization product? What was wrong with the... Exactly. What was it called? Beetlejuice? Something... Beetlejuice, yes. Barn brewed Beetlejuice. I mean, I'm familiar with that. I use that all the time. So you tell me what was wrong. That's a joke. Tell me what's wrong with what they were doing. They violated 21 U.S.C. 331K. And I can read it to you, but what that means is that they manufactured and offered for sale a tobacco product that was adulterated and misbranded. The violation was because the drug was adulterated and misbranded. And when you go to look at the reason why it was adulterated and misbranded, which is at 21 U.S.C. 387B and 387C, there's a series of definitions about why something's adulterated and misbranded, but the reason this product was adulterated and misbranded because it did not go through the pre-market authorization. We're going in a little bit of a circle, but that's okay. I've read the statute. So for instance, I'm not asking about the evidentiary issue that was brought up at the end, but what is the relevance of such evidentiary issues with respect to 24 milligrams or whatever it was? What is the relevance of that with respect to the pre-market authorization? In other words, was the pre-market authorization designed to sort of get at, well, no, it was not 15 milligrams per liter or whatever? Sorry, I think I understand the question. The factual dispute here is whether a component was shipped in interstate commerce. The statutory scheme has an interstate commerce hook on it, and that, I think, is the reason why there's an evidentiary dispute. I mean, I'm happy to address it, but that is the statutory hook for regulating the product. There has to be a showing that the product has been shipped in interstate commerce. That's what they're disputing. We think that's wrong for the reasons we said in our brief, but that's not why there was a violation. The reason there was a violation is because... Had they gone through the pre-market authorization properly? I know the government said they did not, right? So what would the pre-market authorization have allegedly uncovered or revealed? Yes, Jeremy. Do we know that from the record? This was never submitted. This product was never submitted for pre-market authorization. To do so, it requires kind of a search. It's the same kind of searching inquiry that you would have if you had a new drug that you were submitting. You're looking to make sure that it is serving... I think the standard is service public health. What was the concern about... We've had vape cases before with respect to flavors and things like that. Is that what's going on here? We're worried about the flavor appealing to 13-year-olds? I'm not sure, Your Honor, because this product never was submitted for pre-market authorization. Another set were. Those were denied. There was no review of that decision. So I can't say whether if this product was submitted for pre-market authorization, it would be or wouldn't be approved. No, I know you can't say that. I was just concerned about the underlying issue. Again, the purpose of the statute is to protect public health. There is extensive factual findings in the record, in the congressional record and in the statute itself, about the problems that these products pose. And the civil monetary penalty is a crucial step to enforcing that.  My familiarity from other cases is we're concerned about children getting addicted to this stuff. Precisely. Because they're bubblegum flavored. Yes, precisely. And that is the authority that Congress gave to FDA to both deem these products to be subject to the VACA Control Act and ensure that folks aren't going around and selling these. And that's why this enforcement action, this kind of enforcement authority is key. My point is only that this Court can hold that this is a public right without opening the door to any claim of a public health issue being a public right. This really is quite close to... That's the concern. You've put your finger on the concern. I understood. And I think that this Court can say every invocation of the public rights exception has to be taken on its own terms, has to be carefully analyzed. It really is partially historical analysis. And you can say, look, the enforcement action here is about the premarket authorization requirement. There's nothing like that at common law. It looks a lot like the exercise of congressional authority that was at issue in Houston or at issue in a case like Thomas. And we're not opening the door. I think the concern was in AT&T that just because you can invoke a public interest that therefore it's necessarily a public right. I don't think the Court needs to go that far. Thank you. I see my time is running down. On the non-delegation major question issue, the non-delegation question is decided by big-time vapes. The court can't get out of that by reframing it as a major questions case. Even if it was a major questions case, the deeming authority here is clear on the face of the statute and therefore there's no major question issue. And on the evidentiary issue, just quickly, petitioner cites an ingredient list for some other product. That other ingredient list is not relevant. The problem here was that there was a product on sale at the time that there was the review of the store. That product had a list of ingredients. When you went back to the manufacturing part of the store, all those ingredients were in bulk containers that had been shipped in interstate commerce. And so petitioner invokes this other set of product and ingredient list that's just irrelevant and beside the point, and that's what both the ALJ and the board determined. I see my time is running down. Unless there's any other questions. Thank you. Thank you. Okay, Mr. Troutman. Thank you, Your Honor. The government fails to offer any argument to the court which differs from anything that Judge O'Connor rejected in Wolf-Ferrick. Judge Jones, you asked the question about wages. The government, and you pointed out the government takes liberty, the government takes great liberty with what wages said. The Supreme Court did not address or even come close to addressing any of the issues that are similar to this case. As far as the common law analog, it doesn't have to be precise. We're talking about concepts that were in the 17th, 18th century. Certainly our modern law looks at things differently. I am mistaken. I guess you can be charged with a crime for selling an adulterated or misbranded product. Mr. Fraser pointed that out. It doesn't have to be precise, though. It has to be close enough. And the government says that adulteration or misbranding because the product has not satisfied the FDA's interpretation of the marketing standards. Well, a common law is, Judge, as you pointed out, Judge Jones, as you pointed out, the concepts of misbranding and adulteration was a failure to satisfy a weight or volume requirement or a content requirement. It was referred to as a cheat in common law. And the remedy for that was criminal. It was a jury trial. The TCA's concepts, they target the exact same basic conduct as the common law did for adulteration or misbranding of products. In this case, the exception cannot assume the general rule. That would be the result if the government's position prevails. Texas Tobacco Barn did submit part of the PMTA submissions. That was the Exhibit 11, the ingredient list. It is relevant. It was Exhibit 11, a trial. It is relevant. It's sort of odd now that the government says that document is not relevant. It was one of the government's documents at trial. So if the government is saying it's not relevant, then it introduced irrelevant evidence at trial to support that the interstate shipped goods. The ingredient list is what shows what ingredients are in a product. It tells the vendor and who the manufacturer of those ingredients are. The government tried to match that to an array of photographs showing the bulk ingredients in a non-public part of the business establishment. It is relevant. The court should grant review, vacate the appeals panel's final decision with instructions to dismiss the complaint against Texas Tobacco Barn. Let me just ask, what is the ingredient in a cigarette that is dangerous? Is it nicotine or is it tar? It's the tar. It's all of the additives that the tobacco manufacturers make and one thing we learned from the tobacco cases years ago is that to enhance the nicotine, they spiked the, that's the thing we learned from the movie The Insider with Al Pacino, which was, by the way, filmed in my hometown, is they spiked it with ammonia and other additives to make the nicotine more addictive. I know, but the whole deal about, you know, the whole deal about smoking is it causes cancer and emphysema and so on. And so does nicotine cause cancer? I'm not a doctor, but I don't believe it does. I don't believe there's any research that it does. That's sort of a disconnect that I've misunderstood. The old adage is that people smoke for the nicotine but die from the tar. So, thank you, Your Honors. Thank you. All right, thank you. Court is in recess until 9 o'clock tomorrow morning.